# IN THE COURT OF APPEALS OF IOWA

No. 21-1316
Filed February 16, 2022

**IN THE INTEREST OF C.O.,**
**Minor Child,**

**C.M., Mother,**
    Appellant.
_____


Appeal from the Iowa District Court for Black Hawk County, Linda M. Fangman, Judge.


A mother appeals the termination of her parental rights to her child.
**AFFIRMED.**


Jamie L. Schroeder of The Sayer Law Group, P.C., Waterloo, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Tammy L. Banning of Juvenile Public Defender's Office, Waterloo, attorney and guardian ad litem for minor child.


Considered by May, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

"Where do I go if Randy kills my mom?" This was the question that six-year-old C.O. asked a child protective worker from the Iowa Department of Human Services in May 2020. The worker was there to investigate a report that the child's mother and her boyfriend Randy were using methamphetamine. But when the worker arrived at the home, she saw the mother lying on the kitchen floor with the boyfriend standing over her. Later, the mother told the worker that she was on the floor because he attacked her.

C.O. was removed from his mother's custody several days later and adjudicated as a child in need of assistance in June 2020. After more than one year of unsuccessful services geared toward the mother's mental health and substance abuse needs, the juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(f) and (*l*) (2021). The mother appeals,[1] contending only that (1) "termination of her parental rights was not in the child's best interests because the child is strongly bonded to her," and (2) she should have been given more time to "work[] towards reunification."

We use a three-step analysis to conduct our de novo review of termination of parental rights. *See In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). The mother does not challenge the first step of that analysis—"whether any ground for termination under section 232.116(1) has been established." *Id.* at 472–73 (citation omitted). We accordingly confine our review to the second and third steps: "whether the best-interest framework as laid out in section 232.116(2) supports the

---

[1] The child's biological father consented to the termination of his parental rights. He has not appealed.

termination of parental rights" and, if so, "whether any exceptions in section 232.116(3) apply to preclude termination."[2]  *Id.* (citations omitted); *accord In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

*Best Interest.*  When determining what's in a child's best interest, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and the physical, mental, and emotional condition and needs of the child."  *P.L.*, 778 N.W.2d at 40 (quoting Iowa Code § 232.116(2)).  With these considerations in mind, we find termination of the mother's parental rights was in C.O.'s best interest.

The mother's relationships have been marked by domestic violence.  Since 2018, when C.O. was four years old, the department has initiated nine child abuse and family assessments.  During these assessments, the child reported seeing his mother being strangled several times.  After being removed from his mother's custody, C.O. told providers that he was "very fearful of Randy" and scared that his mother will die.  The child's counselor, who meets with him weekly, diagnosed him with "[u]nspecified trauma and stressor related disorder."  The counselor testified that the trauma C.O. experienced in his mother's care led to C.O. exhibiting aggressive behaviors and being anxious and fearful.  These behaviors have improved with counseling and C.O.'s placement in a preadoptive foster home, where he is thriving.  *See* Iowa Code § 232.116(2)(b).

---

[2] The mother's first issue conflates the best-interest step in section 232.116(2) with the permissive-factors step in section 232.116(3)(c) that allows the court to consider the "closeness of the parent-child relationship."  *See A.S.*, 906 N.W.2d at 475.  Giving her the benefit of the doubt, we will consider the two steps separately.

Despite being aware of C.O.'s fear of Randy, the mother chose to continue the relationship. She was arrested multiple times in 2020 for violating protective orders prohibiting contact between them. In March 2021, she was pulled over in a vehicle with Randy, and they were both charged with possession of methamphetamine. And in late May or early June 2021, the child's counselor saw the mother with Randy at a store in town. The counselor testified that after observing this, it was apparent the mother "made her decision to stay, and [the child] does not need to be a part of trauma. He needs stability and [to] be in a home that's safe." We agree. See In re J.E., 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially) ("A child's safety and the need for a permanent home are now the primary concerns when determining a child's best interests.").

Compounding these domestic violence concerns is the mother's substance use. Shortly after C.O.'s removal from her custody, the mother and C.O. tested positive for methamphetamine. Yet the mother denied any drug use and, for most of this case, refused to submit to further testing. The department requested ninety-three drug screens from the mother. She provided only thirteen, nine of which were positive for methamphetamine. Most of those positive tests came after May 2021, when she started testing on a more frequent basis. But even though the mother was complying with the drug tests, she was not sober. The case manager for the department testified that the first few tests at the end of May and beginning of June had "extremely high levels"—higher than anything she had ever seen before. The mother continued to test positive for methamphetamine up until one week before the termination trial in August 2021.

"We hold no crystal ball, and to some extent, the [best-interests] determination must be made upon past conduct." *In re D.G.*, No. 18-1908, 2019 WL 719174, at *3 (Iowa Ct. App. Feb. 20, 2019) (alteration in original) (citation omitted). "While we hope the mother prevails in her battle with substance abuse, 'we cannot deprive a child of permanency after the State has proved a ground for termination' upon such sentiments." *Id.* (quoting *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012)). Based on her past conduct and inability to put her child before her substance-abuse habits, we find termination is in the child's best interest.

**Bond.** The bond between the mother and C.O. does not change our minds. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (stating "the court may use its discretion" under section 232.116(3) "based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship" (citation omitted)). The mother relies on a letter that C.O. wrote after a missed visit. In the letter, C.O. says he loves the mother, misses her, and wants to be with her. When asked about this letter, the case manager for the department testified that C.O. told her that "[h]e wanted Mom to know he loved her. He said he also loves . . . the foster mom. . . . He said he got to have two moms is how he talked about it." She also explained that while the mother shared a strong bond with C.O., "he almost is like a protector to her. . . . [I]nstead of that mother/son bond, it's more of he has to keep her safe and know where she's at and make sure she's alive." Neither the case manager nor the child's counselor thought it would be detrimental to C.O. to sever that bond. *See* Iowa Code § 232.116(3)(c).

And while the visits between C.O. and the mother went well, the mother never progressed beyond supervised visitations due to her positive drug screens and unstable living environment. At the time of the termination hearing, the mother was living with a friend but had plans to fix up a camper and maybe go "back to New Jersey where they're from." The case manager testified this kind of instability would be devastating to C.O., explaining:

> We have a little boy who's turning eight in a couple of weeks who just wants to have best friends and know where he's going to live and know that nobody is going to break in with a knife. He just wants to know he's going to be safe.

This child's safety is our paramount concern, especially considering all the trauma he has already experienced in his young life. *See In re J.V.*, No. 21-0806, 2021 WL 4891063, at *2 (Iowa Ct. App. Oct. 20, 2021). Like the juvenile court, we decline to grant this exception to termination.

***Extension of Time.*** We also find that additional time was not warranted. *See* Iowa Code §§ 232.104(2)(b), .117(5). The mother argues that her "increased participation in visitation, substance abuse and mental health treatment, Family Treatment Court, and consistent drug testing, all gave indication that she could continue to improve her situation." She blames her failure to do so earlier in the case on her mental health and a "brain tumor" discovered in April 2021.[3] This ignores her continued positive drug screens for methamphetamine, the last occurring just more than one week before the termination trial.

---

[3] The information on this medical issue was limited, although a billing note from the mother's psychiatrist refers to a "[r]ecent diagnosis with pituitary adenoma" in early April 2021, with a referral to neurosurgery later that month.

"Time is a critical element. A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting." *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000). As the case manager testified, despite the many services offered by the department, the mother "made the choice to only participate just a few months ago. [C.O.] has waited since the day of his removal for his mom . . . to be ready for him to come home." The child's counselor similarly testified that if the mother was "given extra time, it's just going to prolong working through the trauma, and it's been a year, and I feel it's probably in his best interest to try to continue his life without the trauma." *See In re C.G.*, No. 21-1422, 2022 WL 108544, at *3 (Iowa Ct. App. Jan. 12, 2022) (crediting a therapist's testimony in concluding that "[u]ntil these children reach permanency, they will not be able to process the trauma inflicted on them by the parents"). We agree and, like the juvenile court, decline to grant the mother additional time.

**AFFIRMED.**